```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/16/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
N.S. and O.S., individually and on behalf of      :
their daughter S.S., a minor,                      :
                                                   :
                          Plaintiffs-Appellants,   :
                                                   :
            - against -                            :
                                                   :
NEW YORK CITY DEPARTMENT OF                        :
EDUCATION,                                          :
                                                   :
                          Defendant-Appellee.      :
------------------------------------------------------------X

**OPINION AND ORDER**

13-CV-7819 (VEC)

VALERIE CAPRONI, United States District Judge:

This is another case brought under the Individuals with Disabilities in Education Act

("IDEA"), 20 U.S.C. § 1400 *et seq.*,[1] in which parents of a disabled child seek reimbursement

from their school district for private school tuition.  The Court's heart goes out to the plaintiffs,

who want the very best for their significantly disabled child.  The Court does not begrudge the

parents' desire to place their child in the school that they believe is best.  But the law does not

guarantee disabled children – or, for that matter, gifted or normally-talented children – the best

education that money can buy.  What it guarantees disabled children is a free and appropriate

public education ("FAPE").  In this case, the Department of Education ("DOE") proposed just

that; the parents unilaterally elected to keep their child in the private school that she has attended

for several years.  That was their prerogative, but they have not demonstrated that the public

should reimburse their tuition.

N.S. and O.S., on behalf of their minor daughter S.S., challenge the Individualized

Education Program ("IEP") that the New York City Department of Education created for S.S.

---

[1]        The IDEA was modified and reauthorized by the Individuals with Disabilities Education Improvement Act,
Pub. L. 108-446 (2004).

and challenge the school to which S.S. was assigned.  They unilaterally elected not to send S.S.

to the public school to which she was assigned and sent her instead to Imagine Academy, the

private school that she had attended for several years previously.  After a two-round State review

process in which the parents prevailed at their first hearing and lost at their second, the parents

appealed to this Court, seeking reinstatement of the first administrative decision or a *de novo*

review.  The parties cross-moved for summary judgment.[2]  The parents' motion for summary

judgment is DENIED and the DOE's motion for summary judgment is GRANTED.


## BACKGROUND[3]

### I.    S.S.'s background

Plaintiffs seek tuition reimbursement for the 2011-12 school year.  At that time, S.S. was

14 years old.  She has "multiple disabilities" that qualify her for special education services under

the IDEA.  Ex. C at 1.[4]  As of that school year, S.S. was essentially nonverbal; she was not toilet

---

[2]       Summary judgment, which is the preferred vehicle for determining IDEA cases, functions differently in the
IDEA context.  *See T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  "'[A] motion for summary
judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the
motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth
in the IDEA in developing the specific IEP at issue and determining whether the challenged IEP is reasonably
calculated to enable the child to receive educational benefits.'"  *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 225-
26 (2d Cir. 2012) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir.
2005)) (alterations omitted).

[3]       The Court assumes that any reader of this opinion is familiar with this area of the law and, therefore, will
dispense with the customary apology that this opinion is – like the briefs and the other opinions cited herein –
"replete with acronyms."  *M.H. v. New York City Dep't of Educ.*, 685 F.3d at 223 n.1.  A glossary of IDEA
acronyms is attached as an appendix.  Moreover, because familiarity with the subject matter is presumed, this
opinion will also dispense with the customary recitation of the statutory framework that applies.  Suffice it to say, a
statute passed with the best of intentions, which has done wonders in guiding states' efforts to ensure that disabled
children are afforded an appropriate free public education, has also spawned buckets of litigation.  That litigation, in
turn, is rife with educational jargon.

[4]       Unless otherwise specified, exhibits cited are from the impartial hearing.  Parents' exhibits are marked with
letters; DOE's exhibits are marked with numbers.  Citations to the impartial hearing transcript are marked "Tr. --."
The Court refers to Exhibits 1 and 2 to the Brescia Declaration as "IHO" and "SRO," and refers to the so-called due
process complaint, Compl. Ex. C, as "DPC."

trained and could not safely eat without supervision.  Tr. 66.  Although she could walk, she had a tendency to swallow solid non-food objects; she therefore required constant supervision at all times.  Tr. 67, 71-72.  A DOE examination of S.S. indicated that she had an IQ score below 50 (placing her in the bottom 0.1 percentile) and had an estimated age equivalence of less than two years.  Ex. 8 at 2.

S.S. began attending Imagine Academy ("Imagine") in Brooklyn when she was 11 years old, having transferred from the McCarton School, another private school.  Tr. 139, 150.  Although she showed improvements in some basic functions, by May 2011 she still could not read, write, or hold a pencil.  Tr. 145.  Much of her "academic" learning at Imagine was focused on basic skills such as self-feeding using a spoon, identifying body parts, picking up objects, and toilet training.  Tr. 72-73.  Imagine had a ratio of five students to one teacher and one aide (5:1:1), plus three other adults identified at times in the record as paraprofessionals.  Ex. 6.  Imagine uses Developmental Individual Difference Relationship-based ("DIR") and Applied Behavior Analysis ("ABA") therapy.  Tr. 104, Ex. 2 at 1.[5]

Imagine reported that S.S. was best able to learn and to perform simple tasks when given attention and rewards.  Ex 2 at 2, Tr. 71.  S.S. was not deliberately aggressive towards others, though she would hurt herself when she was frustrated (for example, by biting her hand).  Tr. 142.  Almost all of S.S.'s communication was nonverbal.  Tr. 74.  She had two words in her vocabulary: she said the word "mo," for "more," "pretty consistently," as a "lower guttural vocalization,"  Tr. 75, Ex. 3 at 2, and, she "ha[d] said mama at times,"  Tr. 76.  Although she was capable of making eye contact, for the most part such contact was fleeting.  Ex. 3 at 1, Ex. 6.  At times, S.S. would wave hello and goodbye to people.  Tr. 77.

---

[5]        For a description of ABA and DIR methodologies, *see D.C. ex rel. E.B. v. N.Y. City Dep't of Educ.*, 950 F. Supp. 2d 494, 503 n.15 (S.D.N.Y. 2013).   Putting aside the jargon, they are both behavior modification programs.

II.     **The Committee on Special Education's IEP**

On May 5, 2011, the DOE held a Committee on Special Education ("CSE") meeting to determine S.S.'s IEP for the 2011-12 school year.  Ex. 11, Tr. 20.  During the meeting, N.S. and Imagine Principal Elisa Chrem argued that S.S.'s placement at Imagine was the best possible placement for S.S.  Ex. 11.  Chrem focused on the student-teacher ratio at Imagine; the CSE was considering a placement with six students, one teacher and one teacher's aide (6:1:1), whereas Imagine had S.S. in a class with a 5:1:1 ratio.  Tr. 29-30.  Chrem argued that Imagine's program, which included paraprofessional assistance so that an adult was always with each student, was preferable to what the DOE proposed.  Tr. 30.[6]

The CSE also considered a number of reports, including some from Imagine, Ex. 2, Ex. 3; some from S.S.'s Imagine therapists, Ex. 4, Ex. 5; a classroom observation by a DOE social worker, Ex. 6; a social history, Ex. 7; and a psychological evaluation by a DOE-licensed psychologist, Ex. 8.  With these reports and the testimony of N.S., Chrem, and Elizabeth Jordan, S.S.'s teacher at Imagine, in mind, the CSE prepared S.S.'s IEP. Tr. 21-22, Ex. C at 2.

The IEP noted that S.S.'s language and pragmatic skills were "severely below age level." Ex. C at 3.  It recommended fifteen one-on-one breakout sessions per week, five for occupational therapy, five for physical therapy, and five for speech and language therapy.  *Id.* at 24.  It noted that S.S. required "[a]ssistance with daily hygiene needs" and "during mealtimes, pacing food and fluid intake and control of utensils," as well as supervision while she was entering and exiting "chairs, stairs and the classroom."  *Id.* at 8.  To ensure that S.S. received the personal

---

[6]     Although Chrem's testimony no doubt reflects her best educational judgment, it cannot be ignored that Imagine has a financial interest in touting the value of its own program.  At the time of the meeting regarding S.S.'s IEP, N.S. had already paid $17,500.00 to reserve S.S.'s spot at Imagine for the 2011-12 academic year; $10,000.00 of the deposit was non-refundable.  Ex. N, Ex. M at 1.  Full tuition for the school year is $79,500.00.  Ex. M at 1.

attention she required, the IEP recommended placement in a 6:1:1 environment with a separate full-time paraprofessional dedicated exclusively to assisting her with basic tasks.  *Id.* at 8, 24.

The IEP included a Behavior Intervention Plan ("BIP") that briefly described the behavior of S.S. that interfered with learning and the strategies that DOE recommended to address the behavior.  *Id.* at 26.  Although the BIP referred to a Functional Behavioral Analysis ("FBA"), no FBA is on record in this case.  The BIP proposed rewarding S.S. "for appropriate participation in activities while maintaining appropriate body position and handling objects," using "immediate tangible and intermittent reward systems," and discussed a number of the "supports" that should help to decrease undesirable behavior.  *Id.*

The IEP included several academic and behavioral goals for S.S. that were to be measured at varying intervals.  Some annual goals were measurable – for example, "within one year, [S.S.] will improve readiness skills by identifying colors, numbers, [and] shapes with 80% accuracy as measured monthly by her teacher."  Ex. C at 10.  Other annual goals were more abstract – for example, "[S.S.] will improve her expressive language skills."  *Id.* at 11.  For these abstract goals, the IEP included short-term objectives to verify that S.S. was progressing.  For example, to measure her expressive language skills progress, one of five short-term objectives was that "[S.S.] will consistently exchange a picture in her PECS (picture exchange communication system) book for a desirable item with minimal prompting with 80% accuracy over 10 sessions."  *Id.*  The IEP listed fourteen annual objectives, with an average of just over three short-term measurable objectives that were to be reported in three periodic progress reports.  *Id.* at 10-20.  Several of these goals were formulated with input from Imagine and from S.S.'s speech, physical, and occupational therapists.  Tr. 33-41.

### III.     The placement at Horan

S.S.'s IEP did not designate a school, but the final notice of recommendation ("FNR"),
which the DOE transmitted to N.S. and S.S. on June 15, 2011, identified the Horan School
("Horan") as S.S.'s placement.[7]  Ex. 12, Ex. D.  At Horan, S.S. would have been placed in a
6:1:1 class with a paraprofessional assigned full-time to her; she would also have received
extensive one-on-one therapy sessions proposed by the IEP.  *Id.*[8]

N.S. visited Horan on August 18, 2011, accompanied by Chrem, Imagine's Principal,
purportedly to determine whether S.S. would attend Horan or continue at Imagine for another
year.  Ex. D at 2; Tr. 143; Ex. M at 1.  N.S. testified that when he arrived at the school, Chrem
was "flustered" and indicated that she had "witnessed an altercation in the hallway and the police
had been summoned and carted away a few of the kids."  Tr. 143.  N.S. testified that he and
Chrem believed that the classes that they observed were too high-functioning for S.S. to
participate.  Tr. 143-44, Ex. D at 2.  N.S. also testified that in his view S.S. would not be "safe"
at Horan, citing rough-housing and the high boy-girl ratio among the students.  *Id.*

N.S. testified that Horan personnel told him that they used standardized charts that N.S.
believed did not apply to students like S.S., who "are not testable on a regular spectrum."  Tr.
145.  N.S. – who had trouble contacting Horan and therefore arrived unannounced – was able to
observe three or four classes. Ex. D at 2, Tr. 163-65; *see also* Tr. 143-45.  The teachers he spoke
to mentioned only one class with a 6:1:1 ratio; that class was "all boys."  Tr. 165.  It is not clear
whether N.S. observed a 6:1:1 class or was just told about it.  *Id.*  Although N.S. had no exposure

---

[7]       The parties and the record refer to the Horan School by a number of names, including M. 79, P-79, M079,
and P.S. M079.  For simplicity, the Court uses the term "Horan."

[8]       The IEP proposed a total of 9 hours of one-on-one therapy weekly: 3.25 hours of occupational therapy; 2.5
hours of physical therapy and 3.25 hours of speech therapy.

to 6:1:1 programs, he felt that they were not suitable for S.S.  Tr. 172.  N.S. also disliked the

absence of a "sensory gym" at Horan.  Ex. D at 2.  Shortly after visiting Horan, N.S. notified

DOE that S.S. would be enrolled at Imagine and that the parents reserved the right to seek tuition

reimbursement.

At Imagine, S.S. was in a class with a 5:1:1 ratio but there were always enough adults in

the room to provide one-on-one supervision of each child.  Tr. 101.  Of the adults in the Imagine

class, one – Jordan – was a teacher with a master's degree.  One was working on a bachelor's

degree, but may not have had a degree prior to the 2011-12 school year.  Tr. 102.  The other

three adults ranged from having no college schooling to having some.  Tr. 101-03.  Individuals

assigned to S.S. would rotate; no one was assigned to one student full time.  Tr. 103.  All of the

Imagine instructors engaged in DIR Floor Time and ABA, techniques that they believe

encourage development.  Tr. 103-04.  Imagine recorded data about S.S.'s performance in these

activities and sent the data to N.S. and O.S. every day.[9]  Tr. 159-61.

## IV.   The administrative proceedings

Eight months after notifying DOE that they would not accept a placement in a public

school, in April 2012 S.S.'s parents filed a due process complaint ("DPC") requesting an

impartial hearing on the question of tuition reimbursement.  At that time they asserted that S.S.'s

IEP did not provide her a FAPE.  The DPC, which is intended to put the DOE on notice of the

specific deficiencies in the IEP, discussed at least five concerns with Horan, including the

---

[9]        The record does not reflect the quality of these daily reports, but the Educational Progress Report that
Imagine prepared for S.S. that was submitted as part of the record in this case has a number of errors that lead the
Court to wonder whether it was really prepared solely for S.S. or was a boilerplate report that was used for multiple
children.  *See* Ex. H at 2-5 ("The 1:1 instruction facilitates [S.S.] in maintaining *his* focus . . . .[S.S.] expresses
*himself* through Picture Exchange Communication System (PECS) . . . She has been consistently expressing *his*
desire for the items *he* wants through initiation using pointing to specific PECS . . . . This appears to indicate that
[S.S.]'s continued progress will be most effective in the continued intense 1:1 highly structured, organized and warm
environment of [the] Imagine Academy class in which *he* shows comfort, joy and enthusiasm to succeed.")
(emphasis added).  Jordan, who signed this report, instructed S.S. in a five-student class.

altercation in the hallway, the lack of ABA in the curriculum, the advanced curriculum beyond

S.S.'s capabilities, the absence of a sensory gym, and the boy-girl ratio.  DPC at 1-3.  The DPC

also identified perceived deficiencies in the IEP, including "vague, immeasurable language such

as 'improve'" in some of the annual goals; the absence of any goals regarding S.S.'s

paraprofessional, and the absence of an FBA informing the BIP.  *Id.* at 2.  The DPC also

contained a catchall provision; pursuant to this provision, N.S. and O.S. purported to:

> reserve[] the right to challenge the appropriateness of any recommended placement,
> as well as [their] daughter's entire IEP including, but not limited to, the
> appropriateness of any: services, programs, classes, staffing ratios, performance
> levels, learning characteristics, needs, student participation, accommodations,
> transition services, diploma objectives and drafted annual goals.[10]

*Id.*  The DPC was filed by a non-attorney advocate retained by N.S. and O.S., *id.* at 1, who also

represented N.S. and O.S. in the impartial hearing.  Tr. 1.

The impartial hearing, conducted over four nonconsecutive days, included testimony

from three witnesses:  Jordan, Zwalsky (the DOE teacher who served on the CSE), and N.S.  On

November 7, 2012, the Impartial Hearing Officer ("IHO") issued an opinion finding that S.S.

was denied a FAPE and ordering reimbursement for tuition at Imagine.  IHO at 12.  The IHO

noted the parents' arguments related to the IEP, but did not evaluate them.  Instead, the IHO held

that the evidence on record was insufficient to show that Horan could fulfill the IEP.  *Id.* at 9.

"[T]he DOE presented no testimony concerning the recommended school and the sole DOE

documentary evidence with regard to that placement is the FNR. . . . The DOE has therefore

failed to establish that the placement proffered was appropriate for this student and could meet

her needs and enable her to make appropriate gains."  *Id.* at 9-10.  The IHO further held that

---

[10]      This would appear to be a form provision that the parent advocate attaches to all DPCs inasmuch as there
are no known "diploma objectives" for this student.

Imagine was an appropriate placement and that the equities favored reimbursement because the parents did not "impede the CSE in the development of the IEP." *Id.* at 10-11.

The DOE appealed to a State Review Officer ("SRO"); the parents, now represented by counsel, cross-appealed, asserting that the IHO should have found the IEP deficient in addition to finding the placement inappropriate. SRO at 1. The SRO found that S.S. had been offered a FAPE. The SRO's opinion was considerably longer, more analytical, and more detailed than the IHO's opinion. In addition to a recitation of the parties' arguments, the SRO included a detailed overview of relevant legal precedent. *Id.* at 6-8.[11]

The SRO held that a number of the contentions raised by the parents were waived, as they were neither discussed in the DPC nor stipulated-to by the parties in the impartial hearing. *Id.* at 10. Specifically, the SRO held that the parents waived six arguments, including objections to the student-teacher ratio; the inadequacy of the BIP; the inability of a paraprofessional to teach; the lack of provisions for parent training; the absence of parent input in placement; and the failure "to recommend an appropriate teaching methodology in the IEP." *Id.* at 8. The SRO conducted a thorough analysis of the DPC and the record to determine whether these arguments could fairly be considered waived, *id.* at 8-9, and discussed precedent before holding that they were not properly raised for the first time on appeal, *id.* at 10.

The SRO considered the issues that were preserved for appellate review, first examining the parents' assertion that the IEP did not contain goals that were sufficiently concrete or measurable. *Id.* at 10-11. Emphasizing the fourteen annual goals and forty-four measurable short-term objectives, the reporting schedule, and the fact that many of the objectives were

---

[11]     The SRO noted that it was unnecessary to decide whether equitable considerations favored the parents in their decision to enroll S.S. for a third school year at Imagine. SRO at 16. The DOE did not challenge the IHO's determination that Imagine was a suitable placement for S.S. *Id.* at 5 n.8.

scheduled to be measured over particular schedules, the SRO rejected the parents' assertion that the IEP did not contain measurable goals against which S.S.'s progress could be ascertained. *Id.* Next, the SRO rejected the parents' assertion that the paraprofessional's work could not be measured through the IEP's goals. *Id.* at 11-12. The SRO identified specific objectives in the IEP that were targeted to the functions for which S.S. would have a health care paraprofessional. *Id.* at 12. The SRO found these goals, measuring S.S.'s progress in areas in which the paraprofessional was working, to be more appropriate than goals directed at measuring the paraprofessional, particularly because goals to measure the performance of staff are not required by IDEA or state regulations. *Id.* at 11-12 & n.11.

The SRO considered and rejected the parents' claim that the IEP was deficient because it failed to include an FBA. *Id.* at 12-13. Admitting that "State regulations call for the procedure of using an FBA when developing a BIP," the SRO cited case law holding that "failure to comply with this procedure does not automatically render a BIP deficient." *Id.* at 13. Turning to S.S.'s specific case, the SRO found that the BIP was adequate standing alone, making an FBA was less necessary. *Id.* at 14 & n.12.

Finally, the SRO considered the adequacy of the placement at Horan. *Id.* at 14-16. The SRO noted that Second Circuit precedent does not permit a parent unilaterally to abandon a district's proposed placement based on mere speculation that the district would not adequately adhere to the IEP and still successfully seek tuition reimbursement. *Id.* at 14 (citing *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 195 (2d Cir. 2012)). The SRO concluded that any derogatory information that N.S. gleaned during his visit to Horan was irrelevant to the sufficiency of the proposed IEP. *Id.* at 15-16. The SRO did not, therefore, reach the adequacy of S.S.'s placement at Horan – the sole basis for the IHO's determination that the DOE had deprived S.S. of a FAPE.

*Id.* The SRO issued his decision in August 2013; in November, N.S. and O.S. initiated this action.

## DISCUSSION

### I.     Standard of review

"In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)).  In undertaking this independent review, courts are "restrained by our lack of specialized knowledge and educational expertise; we must defer to the administrative decision particularly where the state officer's review has been thorough and careful."  *M.W. ex rel. S.W. v. N.Y. City Dep't of Educ.*, 725 F.3d 131, 138-39 (2d Cir. 2013) (internal quotation marks and alteration omitted). Two factors guide the level of deference owed to administrative opinions – "the quality of the [administrative] opinion and the court's institutional competence."  *C.F. ex rel. R.F. v. N.Y. City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).  To determine the quality of an opinion, "courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.W.*, 725 F.3d at 139 (internal quotation marks omitted).  The "institutional competence" question hinges on whether a matter involves "'persistent and difficult questions of educational policy,'" *C.L.*, 744 F.3d at 838 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982)), or "'issues of law,' such as 'the proper interpretation of the

federal statute and its requirements,'" *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (alteration omitted) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)).[12]

After a thorough review, the Court finds that the SRO's opinion is well-reasoned and carefully explained. The Court therefore reviews deferentially except as to questions of law. Relevant to this dispute, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *C.F.*, 746 F.3d at 77 n.7 (quoting *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). "Decisions involving a dispute over an appropriate educational methodology," such as the necessity *vel non* of ABA, DIR Floortime or a "sensory gym," are subject to considerable deference. *Id.* Determinations about whether arguments are preserved for SRO or district court review are, however, well within the institutional competence of the courts. *See, e.g.*, *M.H.*, 685 F.3d at 250-51.

The SRO held that many of the parents' arguments were waived and therefore declined to consider them on the merits. SRO at 8-10. Because these arguments do not affect the FAPE analysis, the Court assumes *arguendo* that it may consider these arguments on the merits.[13]

---

[12]    For a thorough discussion of judicial deference to SRO opinions, *see M.H.*, 685 F.3d at 240-44.

[13]    The Court finds the SRO's waiver analysis persuasive and would hold that the parents waived arguments related to (1) the appropriateness of IEP's staffing ratio, (2) the scope of the IEP's goals and (3) the IEP's lack of parent counseling. The parents did not waive arguments related to the BIP or the measurability of the IEP's goals.

There is a split of authority as to the effect of an argument's waiver during the administrative proceedings. *Compare M.P.G. ex rel. J.P. v. N.Y. City Dep't of Educ.*, No. 08-cv-8051(TPG), 2010 WL 3398256, at *8 (S.D.N.Y. Aug. 27, 2010) ("there is arguably no reason that issues not raised in IDEA administrative proceedings may not be raised on appeal to the district court since, by statute, the district court's review may include the consideration of additional evidence") (citing *Arlington Cent. Sch. Dist. v. D.K. and K.K.*, No. 02-cv-2117(DLC), 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002) *and P.G. v. N.Y. City Dep't of Educ.*, 959 F. Supp. 2d 499, 509-10 (S.D.N.Y. 2013); *with B.M. v. N.Y. City Dep't of Educ.*, No. 12-cv-3247(JMF), 2013 WL 1972144, at *7 n.2 (S.D.N.Y. May 14, 2013) ("The fact that a court may consider new *evidence*, however, does not mean that it may consider a new *argument* or *claim*.") (emphasis in original); *B.P. v. N.Y. City Dep't of Educ.*, 841 F. Supp. 2d 605,

## II.    *Burlington/Carter* Prong I

As practitioners in this area are well aware, parents who are dissatisfied with a school district's proposed placement for their disabled children may enroll the children in private school and then seek tuition reimbursement from the state.  Whether their request for reimbursement will be successful is determined by the so-called *Burlington/Carter* test.  *See, e.g., T.M. v. Cornwall Cent. Sch. Dist.,* --- F.3d at ---, No. 12-4301(L), slip op. at 52-53 (2d Cir. Apr. 2, 2014) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993) and *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-71 (1985)).  Prong one of *Burlington/Carter* requires the school district to establish that the IEP was appropriate, *i.e.*, that it actually provided a FAPE.  *M.W.*, 725 F.3d at 135 (2d Cir. 2013).  If the district carries that burden, then reimbursement may not be ordered.  If the district has not offered a FAPE, then reimbursement may be ordered if the parents demonstrate that the private school they selected was appropriate and that the equities favor them.  *Id.*

The first prong of *Burlington/Carter* involves "a two-part inquiry that is, first, procedural, and second, substantive."  *Id.* at 139.  If the IEP is substantively inadequate, then the parent is

---

611 (E.D.N.Y. 2012); *and Snyder ex rel. Snyder v. Montgomery Cnty. Public Sch.*, No. DKC-2008-1757, 2009 WL 3246579, at *8 (D. Md. Sept. 29, 2009).

This Court believes that permitting arguments to be advanced for the first time in the district court effectively eliminates the exhaustion requirement and undercuts the utility of an administrative process.  The Court recognizes, however, that the Second Circuit has not definitively decided the issue.  *C.F.* suggests that waiver might apply only to the administrative hearings, 746 F.3d at 78 ("the waiver rule limits only what may be raised 'at the due process hearing'") (quoting 20 U.S.C. § 1415(f)(3)(B)), but *T.M.* came out the other way, albeit when the case for waiver was stronger.  *T.M. v. Cornwall Cent. Sch. Dist.*, --- F.3d at ---, No. 12-4301(L), slip op. at 52-53 (2d Cir. Apr. 2, 2014).  There is a long line of cases requiring administrative exhaustion of all claims brought under, or potentially brought under, the IDEA.  *See, e.g., Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008) ("Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction.  The purpose of the exhaustion rule is to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances.") (internal quotation marks and citations omitted); *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992) ("The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes.").

automatically entitled to tuition reimbursement.  *R.E.*, 694 F.3d at 190.  Claims predicated on

procedural violations are different.  Such claims "only entitle parents to reimbursement if they

'impeded the child's right to a free appropriate public education,' 'significantly impeded the

parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of

educational benefits.'"  *C.F.*, 746 F.3d at 78-79 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

Nevertheless, the procedural inquiry "is no mere formality, as adequate compliance with the

procedures prescribed would in most cases assure much if not all of what Congress wished in the

way of substantive content in an IEP."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*,

554 F.3d 247, 252-53 (2d Cir. 2009) (*per curiam*) (internal quotation marks and citations

omitted).  Procedural violations must be examined under the totality of the circumstances, *M.W.*,

725 F.3d at 139, and even a procedural violation that in and of itself does not deny a student a

FAPE informs the overall determination of a placement's substantive adequacy, *C.F.*, 746 F.3d

at 81.

> **A.      The CSE made minor procedural errors in the IEP**

The parents identify three specific procedural defects that they allege deprived S.S. of a

FAPE.  They assert that the IEP's BIP was insufficient because the CSE failed to conduct an

FBA and because the BIP listed S.S.'s behavioral problems and solutions without pairing the

proposed solutions with the problematic behavior.  Second, the IEP did not include any

discussion of parent training.  Finally, the IEP's goals were allegedly both unmeasurable and

substantively insufficient.

> **1.      The BIP was sufficient**

"Failure to conduct an FBA[] does not render an IEP legally inadequate under the IDEA

so long as the IEP adequately identifies a student's behavioral impediments and implements

strategies to address that behavior." *M.W.*, 725 F.3d at 140.[14]  When there is no FBA, however,

the Court "must take particular care to ensure that the IEP adequately addresses the child's

problem behaviors." *R.E.*, 694 F.3d at 190.  Where a BIP is "vague," "simply listing behaviors

and strategies" without any indication that the IEP will actually address a child's problematic

behavior, then there is procedural error under the IDEA.  *C.F.*, 746 F.3d at 80.

    In *C.F.*, the student's maladaptive behaviors included yelling, dropping to the floor,

vocalizing non-contextual words and sounds and laughing uncontrollably, *see C.F. ex rel. R.F. v.*

*N.Y. City Dep't of Educ.*, No. 11-cv-157(LTS), 2011 WL 5130101, at *4, 8 (S.D.N.Y. Oct. 28,

2011), *rev'd*, 746 F.3d 68.  These behaviors were "at the heart of th[e] dispute" between C.F.'s

parents and the school district.  *C.F.*, 746 F.3d at 78.  The DOE psychologist who had prepared

C.F.'s BIP noted the problematic behaviors and some means of addressing them but did not

"match strategies with specific behaviors."  *Id.* at 80.  The psychologist acknowledged that

C.F.'s BIP was "vague compared to standards in the field," but asserted that a better plan would

be developed after C.F. was enrolled at his placement.  *Id.* at 80.  The Second Circuit found that

this was insufficient; C.F.'s behavioral impediments were significant and needed to be addressed

in a more detailed BIP.  *Id.* at 80-81.

    Whatever may be required when a student has complicated maladaptive behaviors that

seriously interfere with his and others' learning, courts should not elevate form above substance

or ignore common sense when considering a BIP for a student with relatively uncomplicated

behavior problems.  In this case, S.S.'s behavior problems were identified:  S.S. "seeks attention

---

[14]    New York regulations require CSEs to conduct an FBA "as necessary to ascertain the physical, mental,
behavioral and emotional factors which contribute to the suspected disabilities."  NYCRR tit. 8 § 200.4(b)(1)(v).
"[T]hese regulations do not raise the IDEA bar by rendering IEP's developed without an FBA legally inadequate,"
however.  *M.W.*, 725 F.3d at 140.  When an FBA is necessary, "failure to conduct an adequate FBA is a serious
procedural violation because it may prevent the CSE from obtaining necessary information about the student's
behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E.*, 694 F.3d at 190.

to avoid work that she is expected to do.  She will drop to the floor and throw or drop items.
[S.S.] also tends to put her hands and other objects into her mouth." Ex. C at 26.   Faced with
fairly straightforward problematic behaviors, the BIP proposed rewarding positive behavior such
as participating in activities "while maintaining appropriate body position."  *Id*   The "supports"
that the DOE would use to help S.S. change her behavior include "verbal support, gestures,
physical prompts, planned re-direction, [and] immediate tangible and intermediate reward
systems."  *Id.*  Although the CSE could have done a more exacting job of pairing each behavior
sought to be discouraged with the support that would be used to encourage the corresponding
desirable behavior, a reasonable person reading the plan would understand it:  S.S. will be
positively reinforced for staying in her seat, participating in the educational or therapeutic
activity and not putting inappropriate things in her mouth.   Although this BIP would have been
procedurally inappropriate for a child who has more involved and complicated behavior
problems, it adequately explained and provided solutions for S.S.'s maladaptive behaviors,
which are far from the heart of this dispute.  *Cf. C.F.*, 746 F.3d at 78.[15]  While the BIP was
technically deficient because the CSE did not prepare an FBA, as it was required to do, *R.E.*, 694
F.3d at 190, this technical deficiency did not contribute to the denial of a FAPE.  S.S.'s
behavioral problems – a small piece of her larger disabilities – are adequately addressed in the
BIP and the IEP as a whole.  *M.W.*, 725 F.3d at 140-41.

---

[15]      The parents do not even allege that S.S.'s problematic conduct was unaddressed in the IEP, which as a
whole contained an in-depth discussion of S.S.'s behaviors that impede her learning and suggested resources that
should be used to combat the problematic behaviors.  Ex. C at 6.  Therefore, the "preponderance of the evidence
supports the SRO's decision that the IEP adequately addressed [S.S.]'s behavior, and the sufficiency of [the DOE's]
strategies for dealing with this behavior is precisely the type of issue upon which the IDEA requires deference to the
expertise of the administrative officers."  *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553
F.3d 165, 172 (2d Cir. 2009) (internal quotation marks and citation omitted).

## 2.   Parental counseling should have been incorporated into the IEP

The parents point out that the IEP did not include provisions for parent counseling and training, as required NYCRR tit. 8 § 200.13(d), although they "acknowledge that this issue was not raised" in the previous hearings.  Parents Br. 28.  Nonetheless they bring the Court's attention to this procedural error "to emphasize the deficient (and harmful) nature of defendant's IEP process for [S.S.]."  *Id.*  The parents further assert that, had they had sufficient notice that the IEP would not contain these provisions, they would have "challenged such delinquency in their hearing request."  *Id.*  The Court is baffled by that assertion.  The DOE sent the IEP to the parents in May 2011; in April 2012, *eleven* months later, the parents filed their hearing request. Eleven months is more than sufficient notice of the contents of the IEP.  This is a classic example of an issue that should be considered to have been waived.  That said, failing to include provisions for parent counseling and training was a clear procedural error in the IEP.  *C.F.*, 746 F.3d at 79-80.

School districts are required to provide counseling for parents regardless of whether the counseling is specified in the IEP.  Accordingly, failing to include language requiring counseling in the IEP is unlikely to lead to denial of a FAPE, *R.E.*, 694 F.3d at 191, or to warrant tuition reimbursement, *M.W.*, 725 F.3d at 142.  Of course, this does not mean that the DOE has *carte blanche* to ignore state law; "the presence or absence of procedural violations informs [courts'] determination of substantive adequacy" even when the violations themselves do not deny a FAPE.  *C.F.*, 746 F.3d at 81.

### 3.  The IEP's goals were measurable[16]

The parents challenge the IEP's goals in two ways.  First – in a challenge that was raised in the DPC and analyzed by the SRO – they assert that the IEP's goals were too vague and lacked meaningful measurements.  Second – in a challenge not raised in the DPC that they shoehorn in under the auspices of a generalized discussion of goals – they assert that the IEP's goals did not adequately cover the range of areas in which S.S. was supposed to be progressing.[17] Neither challenge is persuasive.

S.S.'s IEP features fourteen annual goals at varying levels of abstraction, ranging from inherently measurable ("within one year, [S.S.] will improve readiness skills by identifying colors, numbers, [and] shapes with 80% accuracy as measured monthly by her teacher," Ex. C at 10) to more abstract ("[S.S.] will improve her self[-]care skills," *id.* at 19).  Ex. C at 10-20.  Each annual goal has between two and five concrete short-term objectives; there are forty-four such objectives in all.  *Id.*  Many involve clearly measurable items, like "[w]ill ascend three consecutive steps with one hand on the rail, good body mechanics and no loss of balance 4/5 trials."  *Id.* at 19.  Each annual goal indicates that the school would produce three reports of progress per year.  *Id.* at 10-20.  Some of the short-term goals include language requiring that S.S. be evaluated "over 10 sessions."  *Id.* at 11.  The SRO found these goals to be measurable and to "contain sufficiently detailed information regarding the conditions under which each objective was to be performed as required for measurement of progress."  SRO at 11.  The Court agrees.  All of the annual goals that are not inherently measurable have specific and measurable

---

[16]     The parties appear to disagree as to whether this allegation constitutes "substantive" or "procedural" error. *Compare* Parents Br. at 31 (procedural) *with* DOE Br. at 28 (substantive).  Other courts have viewed this as a "procedural" error.  *See, e.g., B.K. v. N.Y. City Dep't of Educ.*, --- F. Supp. 2d ---, No. 13-cv-0393(NGG)(CLP), 2014 WL 1330891, at *8 (E.D.N.Y. Mar. 31, 2014).  The Court favors this approach.

[17]     As discussed above, the Court assumes *arguendo* that none of the parents' arguments has been waived.

short-term objectives.  Ex. C at 11, 13, 18-20; *see B.K. v. N.Y. City Dep't of Educ.*, --- F. Supp.

2d ---, No. 13-cv-0393(NGG)(CLP), 2014 WL 1330891, at \*12 (E.D.N.Y. Mar. 31, 2014).

Thus, contrary to the parents' assertions, S.S.'s goals as provided in the IEP were sufficiently

defined and had measurable components.

Second, the parents assert that the IEP's goals did not cover S.S.'s "important self-care

needs, including toileting, personal hygiene and safely eating solid foods."  Parents Br. at 27.

Although the SRO found that the IEP sufficiently captured S.S.'s need for assistance in these

areas, SRO at 12, the IEP does not require measurement of progress in these areas.  The IEP

included goals related to S.S.'s self-care, but the goals focused on her drinking and dressing.  As

to these goals, the IEP included measurable objectives (e.g. "[S.S.] will drink from an open cup

with maximal assistance 50% of the time," and "[S.S.] will put on a jacket with moderate

assistance 50% of the time").  Ex. C at 19.  Although the IEP provided for S.S. to receive

assistance in the area of hygiene, it did not require her progress to be measured.  This constitutes

a minor deficiency in the IEP's goals.

In sum, the parents raised three procedural flaws with the IEP – it did not include an

FBA, it did not include provisions for parent counseling and it lacked measurable goals as to

S.S.'s hygiene needs.  Even assuming none of these procedural flaws was waived and that all rise

to the level of an error, they do not, either separately or together, constitute the denial of a FAPE.

*See B.K.*, --- F. Supp. 2d at ---, 2014 WL 1330891, at \*17; *T.M.*, -- F.3d at ---, slip op. at 53.

They do, of course, "inform" the Court's analysis of the substantive adequacy of the IEP.  *C.F.*,

746 F.3d at 81.

B.      **The IEP was substantively adequate.**

The parents levy two related substantive critiques against the IEP.  First, they assert that the IEP's proposed staffing ratio of 6:1:1 plus one full-time paraprofessional would not provide S.S. enough individualized attention.  Second, they assert that the IEP did not require instruction as to day-to-day life tasks.  Neither of these arguments is persuasive.

The parents' assertion that the staffing ratio of 6:1:1 plus one full-time paraprofessional was insufficient must be evaluated against what they assert was sufficient – the 5:1:1 staffing ratio at Imagine.[18]  This court is unaware of any decision granting tuition reimbursement based on a quarrel over a proposed 6:1:1 ratio compared to a 5:1:1 ratio.  In some cases in which a student needs individualized attention, a school district's proposal of a 6:1:1 classroom with no dedicated aide and no meaningful 1:1 support has been held to be insufficient.  *See, e.g., R.E.*, 694 F.3d at 194.  When a student benefits from being in a small, less hectic environment, a 12:1:4 classroom is too large where a 6:1:1 program might be appropriate.  *See, e.g., F.O. v. N.Y. City Dep't of Educ.*, 976 F. Supp. 2d 499, 525 (S.D.N.Y. 2013).[19]  Those cases involve substantial differences between the ratio determined to be appropriate and what the DOE offered.  But as a matter of mathematics, the difference between 6:1:1 and 5:1:1 is negligible.  In the slightly larger class a child would receive approximately 16% of the teacher's time; in the slightly smaller class a child would receive approximately 20% of the teacher's time.  Assuming a seven hour day, that translates to 1.12 hours of teacher time each day compared to 1.4 hours – a

---

[18]      It also should be evaluated against the backdrop of the parents having requested her placement in a summer program that had a 12:1:2 student-teacher ratio.  Tr. 22-23.

[19]      Indeed, the record in this case reflects that the CSE considered and rejected a 12:1:1 class as "too large to meet [S.S.]'s needs."  Ex. C at 23.

difference of approximately 15 minutes per day.  That minor distinction in teacher time and attention is simply too small to amount to the denial of a FAPE.

Jordan testified that Imagine's program is superior to that proposed in the IEP because its program is set up so that an adult is always attending to each student.  Tr. 89, 101.  But persistent one-on-one adult attention does not distinguish the program at Imagine, which the parents testified was adequate to address S.S.'s disability, from the program in the IEP.  At Imagine the classroom included five students, one teacher, one teacher's assistant, and three other assistants without college degrees.  Tr. 65-66, 102-03.  The proposal in the IEP called for one teacher, one teacher's aide and one paraprofessional who would be assigned full-time to S.S.  In both situations, S.S. would receive a significant amount of professional time but would never be left without an adult to care for her.  In the case of the IEP, that person would be her assigned paraprofessional; at Imagine, that person would be one of three adults who are not education professionals but who rotate among the children.  In both cases, S.S. would receive full time care.

The crux of the parents' argument is that the IEP-proposed paraprofessional could take care of S.S. but could not teach her to take care of herself.  In support of this argument in this Court, the parents rely on extrinsic evidence including a 2012 Special Education Field Advisory.[20]  The IEP itself is silent on what the full-time paraprofessional would do (just as it is silent on what precisely the teacher, the teacher's aide and the assigned therapists would do), but

---

[20]      These guidelines are a bit obtuse.  They permit one-to-one aides to "assist in related instructional work" while prohibiting them from "provid[ing] instructional services to a student."  James P. DeLorenzo, *Guidelines for Determining a Student with Disability's Need for a One-to-One Aide*, STATE EDUC. DEP'T, UNIV. OF THE STATE OF N.Y. (Jan. 2012), http://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf (accessed May 29, 2014). The guidelines also indicate that a one-to-one aide should be carrying out her responsibilities under the IEP and should be weaning the student off of one-to-one support to the extent possible.  *Id.* at 3.  In the case of S.S., that would mean, at a minimum, that the aide should be taking steps to ensure that S.S. is toilet trained and able to feed herself safely.

S.S.'s "instruction" as to these basic hygiene tasks at Imagine consists predominantly of watching, assisting, prompting and praise.  Tr. 72-73, 78-79, 83-84, 96-99.  While the DOE bore the burden of proving the adequacy of the IEP, that burden does not require specific testimony that the paraprofessional would supervise S.S.'s hand-washing or other activities in the bathroom.

Relatedly, the parents argue that the IEP does not provide for instruction as to basic hygiene tasks, specifying only that S.S. would receive "assistance with daily hygiene needs." Ex. C at 9.  An annual goal of the IEP is improvement of S.S.'s self-care skills, *id.* at 19, and the IEP acknowledges that S.S. "needs maximal assistance with self-hygiene," *id.* at 5.  The DOE recommended assigning a full-time paraprofessional to manage S.S.'s behavior and to supervise her, including specifically her hygiene needs.  *Id.* at 6-7.  It prescribed "praise and encouragement" as a means of eliciting desired behavior from S.S.  *Id.* at 6.  The Court takes all this to mean that the person assigned full-time to monitor S.S. and to care for her would also prompt her regarding hygiene practices (e.g., remind her to wipe herself after elimination; assist her in doing so if necessary and assist in dressing and undressing; remind her to wash her hands) and would praise her as she developed positive habits.  This is exactly what Imagine did.  Tr. 98-99.

But the IEP also specified other services that would address S.S.'s needs relative to basic personal hygiene.  S.S.'s IEP provided for ten weekly breakout 1:1 sessions for occupational therapy and physical therapy (for a total of 5.75 hours per week).  Ex. C at 24.  Those therapists work on just the sort of physical skills that are a necessary predicate for a child to be physically able to tend to their own hygiene needs (e.g., working with buttons or snaps; being able to put clothing on and take it off; physical dexterity to turn faucets on and off).  In contrast, S.S.'s class

schedule at Imagine shows that she received a total of only 3.75 hours of these specialized

therapies each week.  Ex. F.  Indeed, in terms of therapeutic services generally, the program at

Imagine only becomes comparable to the services offered by the IEP if one considers things like

DIR Floortime, Adaptive Living Skills and Music Therapy (which may or may not be as

educationally beneficial as skilled occupational, physical and speech therapy).  *Id.*  In short, the

services in the IEP were very comparable to the services that N.S. sought (and found at Imagine);

the IEP provided ample 1:1 time for S.S. during which her personal hygiene skills could be

developed.

The DOE has carried its burden of establishing that the extensive services prescribed for

S.S. in her IEP were substantively adequate and would have provided S.S. a FAPE.  Although

the minor procedural violations identified above inform the Court's analysis, this is not a close

case, and the Court has no doubt that the IEP was sufficient.  Even if Imagine provided a better

education, "federal law 'does not secure the best education money can buy; it calls upon

government, more modestly, to provide an appropriate education for each disabled child.'"

*M.H.*, 685 F.3d at 246 (quoting *Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577,

1583 (D.C. Cir. 1984)) (alteration omitted).

## C.    Horan was presumptively capable of fulfilling the IEP

The parents finally challenge the ability of Horan to provide S.S. with a FAPE.  The DOE

asserts that the parents' complaints are speculative and that the Court should not consider them.

Because courts have reached dramatically different interpretations of their role in evaluating the

ability of a school to comply with an IEP in cases when parents choose not to avail themselves of

the placement, it is worthwhile to parse out the multiple steps of the inquiry.

### 1.  Legal framework

The case law regarding challenges to a school's ability to provide a FAPE is less than a model of clarity.  *See J.F. v. N.Y. City Dep't of Educ.*, No. 12-cv-2184(KBF), 2013 WL 1803983, at *1-2 (S.D.N.Y. Apr. 24, 2013).  Still, several points are clear.  First, a school district is not required to designate a specific school in an IEP.  *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009).  That said, school districts are not permitted to assign a child to a school that cannot satisfy the IEP's requirements.  *Id.*  There should be few circumstances, however, in which parents can, if there is an adequate IEP, successfully challenge a placement if their child never attended the school.

That said, if a school is factually incapable of providing a FAPE to a student, the student's parents need not subject their child to that placement.  For example, in *D.C. ex rel. E.B. v. N.Y. City Dep't of Educ.*, 950 F. Supp. 2d 494, 499, 501-02, 512 (S.D.N.Y. 2013), the court was faced with a child who had "severe allergies to seafood" that could be triggered even by aerosol exposure to seafood particles.  Although the IEP promised a "seafood free environment," the child's mother was informed during a visit that the cafeteria was not and would not be seafood-free and that seafood was prepared in a number of different areas of the school.  In that sort of limited "life and safety" situation, tuition reimbursement is available even though the child never attended the school.  Similarly, if a wheelchair-bound child received a placement to a multi-level school without elevators or ramps, the parents could clearly successfully challenge the placement and be eligible for tuition reimbursement.  From an academic perspective, if a significantly mentally disabled child like S.S. were placed at a school that serves academically gifted students like Stuyvesant High School, the parents could prevail on a challenge to the

placement without actually enrolling the student.  Or, in the rare case that a placement school

informs a parent of its plans to contravene a student's IEP, the parent may act on the school's

warning and enroll the child elsewhere at public expense.  *Scott ex rel. C.S. v. N.Y. City Dep't of

Educ.*, No. 12-cv-3558(AT). --- F. Supp. 2d ---, 2014 WL 1225529, at *21 (S.D.N.Y. Mar. 25,

2014).

       But those hypotheticals are not this case.  Here, S.S.'s parents object to a placement

based solely on their speculation about what would have occurred at the designated school.  They

can point to no hard evidence that the school would not or could not deliver a FAPE.

"Speculation that the school district will not adequately adhere to the IEP is not an appropriate

basis for unilateral placement."  *R.E.*, 694 F.3d at 195.  Parents who have a sense that a school

might not adhere to an IEP are, of course, free to withdraw their child and pay tuition elsewhere

or enroll with the threat of an *ex post* lawsuit in their pocket.  What they cannot do is unilaterally

place the child elsewhere and then force the school district to reimburse their tuition based on

their subjective belief that the school would not have complied with the IEP.  "[T]he appropriate

forum for such a claim is 'a later proceeding' to show that the child was denied a free and

appropriate public education 'because necessary services included in the IEP were not provided

in practice.'"  *F.L. ex rel. F.L. v. N.Y. City Dep't of Educ.*, 553 F. App'x 2, 9 (2d Cir. Jan. 8,

2014) (summary order) (quoting *R.E.*, 694 F.3d at 187 n.3); *see also R.B. v. N.Y. City Dep't of

Educ.*, No. 12-cv-3763(AJN), 2013 WL 5438605, at *17 (S.D.N.Y. Sept. 27, 2013); *B.K.*, --- F.

Supp. 2d at ---, 2014 WL 1330891, at *21.   Even when there is empirical data that other

students at the school in question have not received all of the services in their IEP  the Second

Circuit has held that a parent must offer something more than mere speculation that the same

problem would present itself in her child's case in order to be eligible for tuition reimbursement. *R.E.*, 694 F.3d at 195; *B.K.*, --- F. Supp. 2d at ---, 2014 WL 1330891, at *20-21.

Although the school district bears the burden of proof during the first stage of a *Burlington/Carter* inquiry, it discharges its duty by establishing that a student's IEP is substantively and procedurally adequate.  *Id*.  It is then incumbent upon the parents to establish that the school district would not have adhered to the written plan.  *See, e.g., M.O. v. N.Y. City Dep't of Educ.*, --- F. Supp. 2d ---, No. 12-cv-4619(MGC), 2014 WL 1257924, at *2 (S.D.N.Y. Mar. 27, 2014); *A.M. ex rel. Y.N. v. N.Y. City Dep't of Educ.*, 964 F. Supp. 2d 270, 286 (S.D.N.Y. 2013); *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 273 (S.D.N.Y. 2012); *but see B.R. ex rel. K.O.*, 910 F. Supp. 2d 670, 678 (S.D.N.U. 2012) (finding an SRO opinion "legally erroneous, for it implicitly reversed the burden on the *school district* to prove that the proposed placement was adequate") (emphasis in original).  The school district may discharge its burden by demonstrating that it developed an IEP that is procedurally and substantively adequate.  Absent non-speculative evidence to the contrary, it is presumed that the placement school will fulfill its obligations under the IEP.  *B.K.*, --- F. Supp. 2d at ---, 2014 WL 1330891, at *22.

Finally, neither party may rely on retrospective evidence to establish a placement's ability or inability to provide services required by an IEP.  *R.E.*, 694 F.3d at 186; *D.C.*, 950 F. Supp. 2d at 512.  In the absence of evidence available to the parents at the time of the decision not to enroll their child at the placement, "'the appropriate inquiry is into the nature of the program actually offered in the written plan,' not a retrospective assessment of how that plan would have been executed."  *K.L. ex rel. M.L. v. N.Y. City Dep't of Educ.*, 530 F. App'x 81, 87 (2d Cir. 2013) (summary order) (quoting *R.E.*, 694 F.3d at 187) (alteration omitted).

**2.  N.S. and O.S. did not rebut the presumption that Horan would implement S.S.'s IEP**

The IHO and SRO analyzed the same information under different conceptions of the law. The IHO improperly believed that the burden was on the DOE to present testimony to establish that the placement would have fulfilled the IEP.  IHO at 9-10.  Because the DOE did not offer any evidence as to Horan's capabilities, the IHO found that it "failed to establish that the placement proffered was appropriate for this student."  IHO at 10.[21]  The SRO, conversely, indicated that the parents' claims as to the placement's deficiency were impermissibly speculative.  SRO at 15-16.  The SRO therefore held that the placement was presumptively capable of providing the services in the IEP, which, as discussed, would have provided S.S. a FAPE.  *Id.*  The Court sides with the SRO.

N.S. visited Horan in August 2011, immediately before S.S. would have begun there.  Ex. D at 2.  He testified that he brought Chrem, Imagine's Principal, to help him evaluate whether Horan would be a suitable alternative to Imagine, where S.S. had been enrolled for years and to which N.S. had already paid a substantial non-refundable deposit.  Tr. 163, Ex. M at 1. According to N.S., when he  arrived for his unannounced visit Chrem immediately informed him that prior to his arrival there had been an altercation in the hallway that included police intervention.  Tr. 143, Ex. D at 2.[22]  During the visit, N.S. spoke to teachers and observed a few classes, one of which had twelve students.  Tr. 163.  N.S. learned from his conversations with Horan faculty that there were many more boys than girls at Horan; he also learned that there was

---

[21]     Although the school district is not required to produce evidence about the school into which the child has been placed, it would be advisable and helpful if the school district would routinely provide such information at the IHO hearing.

[22]     No first-hand evidence was produced regarding the alleged altercation.  It is unknown whether Chrem observed students or third party intruders; it is unknown whether the altercation was of a magnitude that put it out of the ordinary for a New York City public school or whether the police responded because of a "zero tolerance" policy.

a "6-1-1 class that was all boys" that the school might deem suitable for S.S.  Tr. 165.  N.S. felt

the classes he observed were too advanced for his daughter, that Horan would not employ ABA

or DIR Floortime techniques, and that Horan would not capture relevant data regarding S.S.'s

progress to permit the parents to track it.  Tr. 143-45.  He outlined many of these complaints, as

well as a complaint about the absence of a sensory gym, in a handwritten letter to the DOE.  Ex.

D at 2.

       N.S.'s complaints about Horan fall into two categories – those that are entirely

speculative and those that are irrelevant to whether the school would have provided S.S. a FAPE.

In the first category is N.S.'s contention that the school was unsafe.[23]  That claim is predicated

solely on Chrem's assertion that she had seen an altercation in the school.  If one altercation

renders a school unsafe, the Court suspects that every public school in New York – or at least the

vast majority of them – would have to be deemed "unsafe."  The reality is that students have

altercations.  The mere fact that an altercation occurred between students (if they actually were

students) simply does not mean the school is not safe.  *See A.M.*, 964 F. Supp. 2d at 287.  N.S.'s

assertion that the classes were "doing academic skills that were completely out of [S.S.'s]

ability," Tr. 144, would be relevant only if there were some evidence that S.S. would have been

placed in such a class.  There is no such evidence; the parents are simply speculating.  *See M.O.*,

--- F. Supp. 2d at ---, 2014 WL 1257924, at *2.  Insofar as N.S. intended to argue that Horan's

teaching methodologies and data collection were insufficient, because S.S. never enrolled in

Horan and never had a teacher assigned to her, N.S. is simply speculating about the teaching

methods and data collection methodology that would have been used.  *F.L.*, 553 F. App'x at 9.

---

[23]     The Court assumes that N.S. intends to argue that the environment at Horan would have been unsafe during the 2011-12 school year, so as to deny S.S. a FAPE (either alone or in conjunction with other failures).

The record reflects that Horan had a high boy-girl ratio.  Tr. 144, Ex. D at 2.  While N.S. appears to be unnerved by that, there is no evidence in the record explaining why S.S. cannot attend school with boys or why doing so would undercut a FAPE.[24]  Horan also lacked a sensory gym.  Ex. D at 2.  In *R.E.*, E.Z.-L.'s parents levied the same complaint, predicated on the same information.  The Second Circuit determined that the absence of a "sensory gym" is not grounds for finding a FAPE denial.  *R.E.*, 694 F.3d at 183, 195.  There is no reason why this case is any different.  Even if one were to consider the absence of a "sensory gym" a deficiency, that deficiency does not suggest that Horan would be incapable of providing the full complement of services in the IEP; these services were more than sufficient to provide S.S. a FAPE.[25]

Because the school district demonstrated that it offered S.S. a FAPE, the Court does not reach the question of whether the equities favor reimbursement under the third *Burlington/Carter* prong.

## CONCLUSION

The DOE offered S.S. a free appropriate public education.  S.S.'s parents chose to forgo placement in a public school with which they were not familiar and opted to remain with Imagine Academy, a private school with which they were familiar and comfortable.  That was their choice, but they have not demonstrated that the school district must reimburse them for that decision.  For the foregoing reasons, Plaintiffs' motion for a modified *de novo* review, adjudication on the merits, and summary judgment is DENIED.  Defendant's cross-motion for

---

[24]    It is not clear what evidence, if any, would make the gender balance of a school, any more than the racial or religious composition, an appropriate consideration for the Court, but it is clear that parents have not adduced it here.

[25]    There is no evidence in the record to support the notion that a "sensory gym" is an educational necessity, as opposed to a "nice to have" luxury; the record also lacks any scientific, peer-reviewed studies showing that a "sensory gym" is educationally beneficial to a child with S.S.'s disabilities.

summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment for

Defendant, to terminate Dkt. 21 and Dkt. 24, and to terminate the case.

**SO ORDERED.**


**Dated: June 16, 2014**
      **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

**APPENDIX**

| Acronym | Stands for |
|---------|-----------|
| ABA | Applied Behavior Analysis |
| BIP | Behavior Intervention Plan |
| CSE | Committee on Special Education |
| DIR | Developmental Individual Difference Relationship-based |
| DOE | Department of Education |
| DPC | Due Process Complaint |
| FAPE | Free Appropriate Public Education |
| FBA | Functional Behavior Assessment |
| FNR | Final Notice of Recommendation |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| N.S. | S.S.'s father |
| NYCCRR | New York Compilation Codes, Rules and Regulations |
| O.S. | S.S.'s mother |
| PECS | Picture Exchange Communication System |
| SRO | State Review Officer |
| S.S. | The child with a disability seeking reimbursement for her private school tuition |